UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------X

ELIAS SANTANA

      Petitioner,             <u>MEMORANDUM AND ORDER</u>

  -against-                 Civil Action No.
                              CV-03-3946(DGT)

THOMAS POOLE, Superintendent,
Five Points Correctional Facility

      Respondent.

---------------------------X

Trager, J:


    In this petition for a writ of <u>habeas</u> <u>corpus</u> pursuant to 28

U.S.C. § 2254, <u>pro</u> <u>se</u> petitioner Elias Santana seeks relief from

the concurrent sentences imposed on him as a consequence of his

conviction in New York State Supreme Court, Kings County, for

Manslaughter in the First Degree and Attempted Assault in the

First Degree.  For the reasons that follow, the petition is

denied.


## Background

    On November 18, 1999, at approximately 3:30 p.m., in front

of 102 Essex Street in Brooklyn, two rival gang members,

Christian Valdez ("Valdez") of the Netas and King Flaco ("Flaco")

of the Latin Kings, had a fistfight to settle an accusation that

Valdez had disrespected the Latin Kings' hand signal.  A large

number of Latin Kings, including petitioner and Hector Burgos ("Burgos"), were at the fight scene to support Flaco. Dissatisfied with Flaco's defeat, the crowd of Latin Kings rushed at Valdez.  One attempted to stab Valdez, but was thwarted by Marcos Valle ("Valle").  Petitioner subsequently pointed a gun at Valle.  Burgos took the gun from petitioner and shot Valle in the chest.  Valle died from his wound.

Petitioner and Burgos were jointly tried for Murder in the Second Degree (New York Penal Law § 125.25(1)), Attempted Assault in the First Degree (New York Penal Law §§ 110; 125.10(1)) and related charges.


**(1)**

The prosecution presented three eyewitnesses at trial, including Valdez.  Valdez testified that a few days before the shooting, he had held his hand to his mouth with his thumb and pinkie extended pretending talk on a telephone during a conversation with a friend.  Flaco observed this gesture and accused Valdez of disrespecting the Latin Kings' crown, a hand signal that is formed by holding the thumb, index and pinkie fingers up and the two middle fingers down.  A loud argument ensued between Flaco, Valdez and Valdez's sister Jessica, which required police intervention.  Tr. at 321-22.

On the morning of November 18, 1999, Valdez was walking to school with his friend Juan Gonzalez ("Gonzalez") when Flaco, petitioner and two other Latin Kings approached. Petitioner asked Valdez why he had disrespected the Latin Kings' crown. Valdez explained that it was a misunderstanding and that he had been pretending to use a telephone. Petitioner then told Flaco to take care of the matter. After Flaco again accused Valdez of disrespecting the Latin Kings' crown, petitioner told Valdez that he would see him after school. Tr. at 322-24.

After that conversation, Valdez decided against going to school. Instead, he and Gonzalez went back to Gonzalez's home. They arrived there around 9:30 a.m., whereupon Gonzalez told his mother Ana Figueroa ("Figueroa") about the recent transpirings. Figueroa telephoned Valle, her boyfriend, and told him that they would have to pick up Jessica at the school for her protection. Tr. at 324-25. Valdez testified that he, Figueroa and Gonzalez arrived outside the school at approximately 12:30 p.m. and that Valle joined them there. Soon thereafter, petitioner, Burgos, Flaco and two other Latin Kings approached. Petitioner said: "Let's get it on," and told Valdez's group to meet them at the cross streets of Fulton Street and Grand Street. Instead of complying, Valdez's group picked up Jessica and went to Valdez's home on Essex Street. Tr. at 326-27.

After dropping off Valdez and Jessica, the others took a cab back to Gonzalez's home. A short time later, Valdez left his building to go outside. Waiting were petitioner, Burgos and two other Latin Kings. Valdez tried to convince them to put the matter aside, but they threatened to "shoot up the block" if he did not agree to fight. Tr. at 328.

Meanwhile, Figueroa, Gonzalez and Valle had arrived back at Gonzalez's home. Upon their arrival, Gonzalez testified that he telephoned Valdez's home and discovered that Valdez was outside arguing with several Latin Kings. Figueroa, Gonzalez and Valle immediately thereafter took a cab back to Essex Street. They arrived around 3:30 p.m., and saw that twenty to twenty-five Latin Kings were congregating in front of Valdez's home. Valdez was still arguing with petitioner and Burgos. Tr. 236-38.

At this point, Valdez testified that a Latin King named King Lobo approached Valle and said that Valdez would have to fight Flaco. King Lobo also told Valle that they were too old to be involved in Flaco and Valdez's fight, and that he would give Valle his word that everyone could go their separate ways after the fight's conclusion. Valle told Valdez that he needed to fight to end the situation. Valdez agreed, and the fight began in middle of the street. While Valle stood nearby, Figueroa and

Gonzalez watched from the sidewalk in front of 102 Essex Street. Tr. at 330-33.

The fight lasted about five to ten minutes. Valdez knocked out Flaco. When that happened, the mob of Latin Kings rushed at Valdez. Several removed their coats, inviting Valdez to fight with them. Approximately eight others, petitioner included, pulled out knives. Saying "No, no, no, no. It's not going to stay like that," a heavyset Latin King drew his knife and attempted to stab Valdez. Valle stepped in front of Valdez and pushed the knife-wielder's hand away. Tr. at 333-35.

Valle then told Valdez to get inside the fenced yard at 102 Essex Street. Gonzalez also called for Valle and Figueroa to run inside the yard. They were all able to get inside, but were pursued by about ten to fifteen Latin Kings. Petitioner pushed his way through the gate as Figueroa was trying to close it. He flashed his knife and told Figueroa not to lock the gate. She backed away. Valle then told Valdez to run into the house. As Valdez ran into the house to call the police, he saw that a number of Latin Kings had begun hitting and kicking Valle. Tr. at 335-38.

Figueroa and Gonzalez corroborated Valdez's testimony up to this point. Tr. at 126-48, 230-48. They also testified as to the events that transpired after Valdez ran into the house.

Figueroa and Gonzalez testified that when Figueroa tried to pull the attackers off of Valle, two Latin Kings pushed her aside and held her back. Another Latin King threatened to stab Gonzalez if he moved. Three Latin Kings then picked up Valle and held him in midair. Petitioner and Burgos stood in front of Valle at a distance of three to five feet. Petitioner pulled a black handgun from his waist and pointed it at Valle. Burgos told petitioner to shoot, saying: "Do it. Do it." Petitioner did not immediately react. A couple seconds later, Burgos grabbed the gun from petitioner and shot Valle in the chest. Petitioner, Burgos and all the other Latin Kings fled. Valle died moments later. Tr. at 148-53, 248-54.

Detective Richard Barrios ("Barrios") testified that, on November 27, 1999, Burgos stated that he was present when the shooting occurred but that "someone else had the gun and that someone else shot Marcos Valle." Tr. at 68-69. The court instructed the jury that it could consider Burgos's statement against Burgos only. Tr. at 70.

### (2)

Petitioner testified on his own behalf. Petitioner generally denied the testimony given by Figueroa, Gonzalez and Valdez. Petitioner stated that he hung out with the Latin Kings

6

only sparingly, and that the crown symbol was not as important to him as it was to other Latin Kings.  Tr. at 430-32.

Petitioner stated that he remembered seeing Figueroa, Gonzalez, Valdez, Valle and Jessica outside the school around 11:30 a.m.  However, according to his testimony, it was the Valdez group that had a problem with Flaco, not the other way around.  Petitioner testified that Valdez's group intended to fight Flaco at Fulton Street.  Petitioner did not want to get involved, so he went to get some pizza.  Upon arriving at his home on Essex Street, petitioner stated that there were twenty Latin Kings hanging out on the block.  Petitioner asked what was happening and was told that Valdez and Flaco were about to fight. Petitioner told them that he did not want to be involved.  Tr. at 422-25.

Suddenly, the group of Latin Kings began to run up the street.  Petitioner stated that he could not see what was happening because there were so many people.  He asked Burgos what was happening, but Burgos did not know.  Together, the two of them walked up the block to see for themselves what was occurring.  Petitioner said that he still could not see anything because of all the people.  All of a sudden petitioner heard a gunshot.  Not knowing where it came from, he momentarily ducked down then ran home.  Tr. at 425-28.

On May 23, 2000, petitioner was convicted of Manslaughter in the First Degree and Attempted Assault in the First Degree. On June 23, 2000, he was sentenced to concurrent determinative sentences of twenty years for the manslaughter count and eight years for the attempted assault count.

On direct appeal, petitioner argued: (1) that the evidence presented at trial was legally insufficient to prove guilt beyond a reasonable doubt; (2) that the jury's verdict was against the weight of the evidence; and (3) that the trial court denied him the right of confrontation by allowing Detective Barrios to testify as to Burgos's statement.

On May 13, 2002, the Appellate Division affirmed petitioner's conviction, holding (1) that the legal sufficiency claim was unpreserved and in any event without merit; (2) that the verdict was not against the weight of the evidence; and (3) that the "remaining contention," the confrontation issue, was without merit. <u>People v. Santana</u>, 294 A.D.2d 453, 741 N.Y.S.2d 743 (2d Dep't 2002). On July 31, 2002, the New York State Court of Appeals denied petitioner's application for leave to appeal. <u>People v. Santana</u>, 98 N.Y.2d 701, 747 N.Y.S.2d 420 (2002). On October 3, 2002, the Court of Appeals denied petitioner's <u>pro</u> <u>se</u>

application for reconsideration.  People v. Santana, 98 N.Y.2d
771, 752 N.Y.S.2d 12 (2002).


## Discussion

On September 4, 2003, petitioner filed this petition for a
writ of habeas corpus, raising the three claims presented to the
state courts.

### (1)

### Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996
("AEDPA"), Pub. L. No. 104-132, 110 Stat. 114, establishes a
deferential standard of review for habeas corpus petitions.
Under AEDPA, a federal court may grant habeas relief with respect
to a federal claim adjudicated on the merits in state court only
if that adjudication was "contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States," or was
"based on an unreasonable determination of the facts in light of
the evidence presented in the State court proceeding."  28 U.S.C.
§ 2254(d).  Determination of factual issues made by a state court
"shall be presumed to be correct," and the petitioner "shall have
the burden of rebutting the presumption of correctness by clear
and convincing evidence."  28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to" Supreme Court
precedent if the court "applies a rule that contradicts the
governing law," or "confronts a set of facts that are materially
indistinguishable from a decision of [the Supreme] Court and
nevertheless arrives at a different result from [Supreme Court]
precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A
decision involves an "unreasonable application" of Supreme Court
precedent if the state court "identifies the correct governing
legal rule from the [Supreme] Court's cases but unreasonably
applies it to the facts of the particular state prisoner's case."
Id. at 407-08. The Supreme Court has emphasized that the
reasonableness of the state court's application of the law is to
be assessed objectively rather than subjectively. See id. at
409-10. Accordingly, "a federal habeas court may not issue the
writ simply because that court concludes in its independent
judgment that the relevant state-court decision applied clearly
established federal law erroneously or incorrectly." Id. at 411.


### (2)

### Sufficiency of the Evidence

Petitioner's first claim is that the evidence introduced at
trial was legally insufficient to prove beyond a reasonable doubt
that he acted with the mental culpability of an accessory to the

shooting of Valle and the attempted knife assault on Valdez.
Pet. at ¶ 12(A). Such a claim implicates federal due process
principles and is subject to habeas review. See Jackson v.
Virginia, 443 U.S. 307, 315 (1979) ("[T]he Due Process Clause of
the Fourteenth Amendment protects a defendant in a criminal case
against conviction except upon proof beyond a reasonable doubt of
every fact necessary to constitute the crime with which he is
charged."). However, respondent argues that this claim is
procedurally barred, because the Appellate Division disposed of
it as unpreserved. Resp't Mem. of Law at 2.

**a. Procedural Default**

State court decisions that rest on an adequate and
independent state procedural default are not subject to federal
review. Fama v. Comm'r of Correctional Servs., 235 F.3d 804, 809
(2d Cir. 2000). Federal review will be barred only where the
state court "relied on the procedural bar as an independent basis
for its disposition of the case." Harris v. Reed, 489 U.S. 255,
261-62 (1989). This reliance "must be 'clear from the face of
the opinion.'" Fama, 235 F.3d at 809 (quoting Coleman v.
Thompson, 501 U.S. 722, 735 (1991)).

### i. Independent Requirement

The state court's reliance on the procedural bar here is clear.  Petitioner's legal sufficiency claim was denied by the Appellate Division for failure to comply with New York's contemporaneous objection rule.  Santana, 294 A.D.2d at 453, 741 N.Y.S.2d 743 (citing New York Criminal Procedure Law § 470.05(2) for the conclusion that petitioner "failed to preserve for appellate review his contention that the evidence adduced at trial was not legally sufficient to support his convictions").  The rule requires that an objection to a ruling be lodged "at the time" of the ruling or "at any subsequent time when the court had an opportunity of effectively changing the same," and the objection be sufficiently specific to "make [the defense's] position with respect to the ruling or instruction known to the court."  New York Criminal Procedure Law § 470.05(2).  In applying the contemporaneous objection rule to legal sufficiency claims, the New York Court of Appeals has held that a general motion to dismiss is inadequate, and that the defendant must specify the deficiency in proof.  See, e.g., People v. Gray, 86 N.Y.2d 10, 19, 652 N.E.2d 919, 629 N.Y.S.2d 173 (1995) ("[W]here a motion to dismiss for insufficient evidence [is] made, the preservation requirement compels that the argument be 'specifically directed' at the alleged error.").

Here, petitioner's trial counsel moved to dismiss at the close of the prosecution's case. In general terms, counsel requested the court to "dismiss all the charges in the indictment . . . on the grounds the People have failed to prove a prima facie case." Tr. at 401. There was no further explanation, and the trial court denied counsel's motion, holding that "all elements of the crimes charged, of all of the crimes charged have been made out on the People's direct case." Tr. at 401. Petitioner's trial counsel repeated the same motion to dismiss following the defense's case, again without citing any specific legal argument. Tr. at 460. The trial court denied this motion as well. Tr. at 460.

Petitioner's trial counsel made only a general motion to dismiss, and failed to alert the trial court to the mental culpability issue raised in the Appellate Division and here on habeas review. The Appellate Division, therefore, properly found petitioner's legal sufficiency claim to be procedurally barred. It is of no consequence that the Appellate Division went on to state that, "[i]n any event, viewing the evidence . . . we find that it was legally sufficient to establish defendant's guilt beyond a reasonable doubt." Santana, 294 A.D.2d at 453, 741 N.Y.S.2d 743. The procedural default rule remains effective even where state courts issue an alternative holding that addresses

the procedurally defaulted claim on the merits.  <u>Fama</u>, 235 F.3d
at 810 n. 4 ("[W]here a state court says that a claim is 'not
preserved for appellate review,' and then ruled 'in any event' on
the merits, such a claim is not preserved.").  Thus, the
procedural default relied on by the Appellate Division
constituted an "independent" state law ground for the decision.

### ii. Adequacy Requirement

The remaining question is whether the procedural bar relied
on by the Appellate Division is "adequate" to preclude federal
habeas review.  A procedural bar is adequate only if it is based
on a rule that is "firmly established and regularly followed" by
the state courts.  <u>Ford v. Georgia</u>, 498 U.S. 411, 423-24 (1991).
Additionally, "the adequacy of a state procedural bar is
determined with reference to the 'particular application' of the
rule."  <u>Cotto v. Herbert</u>, 331 F.3d 217, 241 (2d Cir. 2003)
(quoting <u>Lee v. Kemna</u>, 534 U.S. 362, 387 (2002)).  Therefore,
whether application of the procedural bar is firmly established
and regularly followed must be judged in the context of "the
specific circumstances presented in the case, an inquiry that
includes an evaluation of the asserted state interest in applying
the procedural rule in such circumstances."  <u>Id</u>.  In this
circuit, the "guideposts" relevant to this determination include:

> (1) whether the alleged procedural violation was
> actually relied on in the trial court, and whether
> perfect compliance with the state rule would have
> changed the trial court's decision; (2) whether state
> case law indicated that compliance with the rule was
> demanded in the specific circumstances presented; and
> (3) whether petitioner had "substantially complied"
> with the rule given "the realities of trial," and,
> therefore, whether demanding perfect compliance with
> the rule would serve a legitimate governmental
> interest.

Id. at 240 (citing Lee v. Kemna, 534 U.S. at 381-85).

The applicability of the first factor here is questionable considering that "the lack of a contemporaneous objection would not . . . be mentioned by the trial court." Id. at 242. However, to the extent that petitioner's failure to specifically raise the lack of mental culpability claim denied the trial court the opportunity to consider and address the matter, that failure was actually relied on by the trial court. See id. at 243 (while "the impact of a timely objection involves a certain degree of speculation," it is possible that "the trial court may well have come to a different conclusion" had the reasons for the objection been given).

Application of the second factor here is much less uncertain. New York law is clear that failure to alert the trial court to the specific grounds for a motion to dismiss on insufficient evidence precludes use of that motion to create a question of law on appeal. See, e.g., Gray, 86 N.Y.2d at 19, 652

N.E.2d 919, 629 N.Y.S.2d 173; People v. Clayton, 284 A.D.2d 407, 726 N.Y.S.2d 282 (2d Dep't 2001); People v. Robinson, 251 A.D.2d 354, 673 N.Y.S.2d 1008 (2d Dep't 1998); People v. Udzinski, 146 A.D.2d 245, 541 N.Y.S.2d 9 (2d Dep't 1989). Consequently, state case law indicates that compliance with the procedural rule was demanded in the circumstances presented.

As for the final factor, petitioner cannot show that he "substantially complied" with New York Criminal Procedure Law § 470.05(2) through his generalized motions to dismiss. These motions could not alert the trial court to the claim raised at the Appellate Division: that the prosecution failed to present sufficient evidence to prove beyond a reasonable doubt that petitioner acted with the mental culpability of an accessory to the shooting of Valle and the attempted knife assault on Valdez.

This analysis demonstrates that the Appellate Division's reliance on the procedural bar here constituted an "adequate" ground for their decision. Since it has already been determined that its reliance was an "independent" ground, petitioner's legal sufficiency claim is procedurally defaulted.


### iii. Cause or Fundamental Miscarriage of Justice

A procedural default will not bar federal habeas review where the petitioner can show both cause and prejudice or a

fundamental miscarriage of justice. <u>Fama</u>, 235 F.3d at 809.

Here, even upon a liberal reading of the <u>pro</u> <u>se</u> petition,

petitioner makes no claim of circumstances constituting "cause"

for the procedural default. In order to demonstrate a

fundamental miscarriage of justice, petitioner is required to

make a showing of actual innocence. <u>See</u> <u>Dunham v. Travis</u>, 313

F.3d 724, 730 (2d Cir. 2002). Rather than provide any evidence

of actual innocence, petitioner merely attacks the strength of

the prosecution's case at trial. Therefore, federal <u>habeas</u>

review of petitioner's legal sufficiency claim is barred.


**b. Merits**

Notwithstanding his procedural default, petitioner's

sufficiency of the evidence claim is without merit. In reviewing

a sufficiency of the evidence claim, a federal <u>habeas</u> court may

grant relief only if it finds that when the evidence is viewed

"in the light most favorable to the government, . . . no

'rational trier of fact could have found proof of guilt beyond a

reasonable doubt.'" <u>United States v. Jones</u>, 16 F.3d 487, 490 (2d

Cir. 1994) (quoting <u>Jackson v. Virginia</u>, 443 U.S. at 319). The

court may not "make its own subjective determination of guilt or

innocence." <u>Jackson v. Virginia</u>, 443 U.S. at 319 n.13. Rather,

where the record supports conflicting inferences, the court "must

presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326.

Petitioner claims that the evidence presented at trial did not support a finding of guilt beyond a reasonable doubt. Pet. at ¶ 12(A). First, petitioner maintains that the evidence against him on the manslaughter charge was not legally sufficient because he did not share Burgos's intent to seriously injure Valle when Burgos fatally shot him. Id. Second, as to the attempted assault charge, petitioner claims that the evidence did not show that he had the intent to commit an assault on Valdez. Id.

New York law states that a person commits manslaughter in the first degree when, "with intent to cause serious physical injury to another person, he causes the death of such person." New York Penal Law § 125.20(1). A person commits assault in the first degree, when "with intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument." New York Penal Law § 120.10(1). Finally, "[a] person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime." New York Penal Law

§ 110.00.  Petitioner was prosecuted and convicted under the theory that he acted in concert with his fellow Latin Kings gang members in the commission of the crimes.  Therefore, in order to sustain petitioner's conviction for the first-degree manslaughter of Valle and the attempted first-degree assault on Valdez, the evidence must show that petitioner acted with the mental culpability necessary to commit the crimes and that he solicited, requested, commanded, importuned, or intentionally aided the principal to commit the crimes.  <u>See</u> New York Penal Law § 20.00.

Here, there was sufficient evidence of a community of purpose and participation to establish petitioner's guilt of attempted first-degree assault and first-degree manslaughter. Petitioner's culpability was established by the testimony of several eyewitnesses.  Figueroa, Gonzalez and Valdez testified that petitioner was amongst the mob of twenty to twenty-five Latin Kings who, unsatisfied with the outcome of the fight between Flaco and Valdez, swarmed after Valdez.  Tr. at 140, 241, 333-37.  Their testimony also established that eight of these gang members, including petitioner, were brandishing knives.  Tr. 141-46, 241-44, 334.  Figueroa, Gonzalez and Valdez further testified that a heavyset Latin King tried to stab Valdez, but was stopped by Valle.  Tr. at 141-42, 241, 335.  From these acts, the jury could have readily inferred that the mob of Latin Kings

intended to do Valdez bodily harm.  Moreover, as this testimony showed that petitioner was a knife-carrying member of the mob, the jury could also infer that petitioner shared its intent to assault Valdez.  As such, petitioner was liable for the acts of the heavyset Latin King who attempted to stab Valdez.  See, e.g., People v. Kim, 255 A.D.2d 337, 681 N.Y.S.2d 549 (2d Dep't 1998) (evidence that defendant was at the scene of a gang-beating with a baseball bat in hand and victim testified that all gang members participated in assault established a community of purpose even though victim's testimony did not specifically inculpate defendant); People v. Haire, 96 A.D.2d 1110, 467 N.Y.S.2d 703 (3d Dep't 1983) (evidence that defendant and codefendant pursued victim brandishing knives and that codefendant lunged at victim and stabbed him supported finding that defendant intentionally aided codefendant with intent required for assault).

The evidence also demonstrated that petitioner acted in concert with Burgos in the shooting of Valle.  Figueroa, Gonzalez and Valdez testified that after Valle prevented the assault on Valdez, petitioner and the other Latin Kings chased Valdez and Valle as they tried to escape into the yard at 102 Essex Street. Tr. at 144-45, 242-44, 335-36.  They further testified that as some gang members jumped over the fence, petitioner threatened Figueroa with a knife and pushed his way into the yard.  Tr. at

145-46, 244, 336-37. Figueroa and Gonzalez then testified that
after Valdez had run inside the adjoining building to call for
help, petitioner and the other Latin Kings began attacking Valle.
Tr. at 146-47, 245-47. Soon thereafter, while other gang members
held Figueroa back and threatened Gonzalez with a knife,
petitioner and Burgos stood in front of Valle, who was held in
midair before them. Tr. at 147-48, 247-49. At that point, it
was petitioner who pulled out a gun and pointed it at Valle. Tr.
at 150-51, 249-50. When petitioner did not shoot quickly enough
on Burgos's command, Burgos grabbed the gun and shot Valle in the
chest. Tr. at 151-52, 251-52.

The jury could reasonably infer from this testimony that
petitioner intended to cause serious physical injury to Valle.
From petitioner's attack on Valle and his subsequent act of
pulling a gun on Valle, the jury could reasonably conclude that
events had gone beyond mere intimidation. Even though petitioner
may have hesitated to fire the fatal shot, the jury could still
find petitioner's intent remained undiminished. The evidence,
therefore, was sufficient to establish his guilt beyond a
reasonable doubt. See, e.g., People v. Martinez, 30 A.D.3d 353,
817 N.Y.S.2d 288 (1st Dep't 2006) (evidence that defendant and
codefendant chased victim and struck him as he lay incapacitated

on the ground established a community of purpose even though codefendant inflicted the fatal injuries).

Petitioner admitted that he was part of the crowd that formed after the fight, but claimed that he was unaware of what was happening and that he joined the mob out of curiosity.  Tr. at 426.  Petitioner also testified that he did not know where the gunshot came from, and that he ran home after hearing it.  Tr. at 427.  To the extent that petitioner attacks the credibility or perception of the trial witnesses, including the jury's apparent rejection of his testimony, deference must be given to the jury's findings of fact in favor of the prosecution.  Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996).  Since petitioner's conviction was based on sufficient evidence, habeas relief on this ground is denied.


**(3)**

**Weight of the Evidence**

Petitioner's second claim is that the verdict was against the weight of the evidence.  Pet. at ¶ 12(A).  This claim does not raise a federal constitutional issue and is not cognizable on habeas review.  "A weight of the evidence argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5)" which empowers the intermediate appellate courts of

New York to make weight of the evidence determinations.  Correa
v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001).  Thus,
unlike his sufficiency of the evidence claim, which is based on
federal due process principles, petitioner's weight of the
evidence claim alleges "an error of state law, for which habeas
review is not available."  Douglas v. Portuondo, 232 F. Supp. 2d
106, 116 (S.D.N.Y. 2002).


**(4)**

**Confrontation Clause Violation**

Petitioner's final claim is that the introduction into
evidence of Burgos's redacted statement at the joint trial
violated his right of confrontation as interpreted by the Supreme
Court in Bruton v. United States, 391 U.S. 123 (1968).  At trial,
Detective Barrios testified that Burgos had said, in substance,
"that he [Burgos] was there, that someone else had the gun and
that someone else shot Marcos Valle."  Tr. at 69.  Burgos
originally had named petitioner as the "someone else."

The Second Circuit has held that a Bruton violation is not
suffered where the co-defendant's inculpatory statement is
redacted so that "'the statement standing alone does not
otherwise connect [the complaining defendant] to the crime[].'"
United States v. Williams, 936 F.2d 698, 700 (2d Cir. 1991)

(quoting <u>United States v. Tutino</u>, 883 F.2d 1125, 1135 (2d Cir.
1989)).  Here, the redaction substituted the neutral phrase
"someone else" for petitioner's name.  This redaction was not
rendered ineffective by the circumstances of the case; given the
extensive trial testimony which placed approximately fifteen
Latin Kings at the scene of the shooting, it cannot reasonably be
said that the jury necessarily substituted petitioner's name for
the "someone else" referred to in Burgos's statement.  Also, the
trial court gave a limiting instruction.  These actions
adequately address <u>Bruton</u>'s concern.  <u>See</u> <u>United States v.</u>
<u>Williams</u>, 936 F.2d at 700-01; <u>United States v. Knuckles</u>, 581 F.2d
305, 312-13 (2d Cir. 1978).  Therefore, petitioner's
confrontation claim is without merit, and <u>habeas</u> relief on this
ground is not warranted.

**Conclusion**

For the foregoing reasons, Santana's <u>habeas</u> <u>corpus</u> petition is denied.  Further, a certificate of appealability shall not issue because petitioner has not demonstrated a substantial showing of a constitutional violation.  <u>See</u> 28 U.S.C. § 2253(c)(2).  The Clerk of the Court is directed to enter judgment accordingly and close the case.

Dated: Brooklyn, New York
      November 30, 2006

SO ORDERED:

_____/s/_____
David G. Trager
United States District Judge